**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-269-TNM** |
| **SEAN C. CORDON,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Sean Cordon to three months of home detention; a probationary term of three years; 60 hours of community service; and $500 in restitution; and the mandatory $10 special assessment.

## I.    Introduction

The defendant, Sean Cordon and his brother, Kevin Cordon, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than a million dollars' worth of property damage.

Sean Cordon pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. While recognizing the defendant did not personally engage in violence or property destruction, a significant sentence is appropriate in this case because the defendant (1) witnessed rioters fighting with law enforcement outside the Capitol and persisted in entering anyway; (2) entered soon after the initial breach at the Senate

1

Wing door by climbing through a window; and (3) dressed in preparation for violence by dawning a vest of body armor and carrying a gas mask.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.

## II.      Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 24 (Statement of Offense), at 1-7. As this Court knows, a riot cannot occur without rioters, and each rioter's actions – from the most mundane to the most violent – contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

### Sean and Kevin Cordon's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, Sean Cordon and his brother, Kevin Cordon, (collectively "the Cordon Brothers") traveled from Los Angeles, CA to Washington, D.C. to attend a rally on the Ellipse of the National Mall. The Cordon Brothers arrived at the rally ready for violence. They each wore light body armor and carried a gas mask.[1] They each purported to have these items for personal protection from possible counter-protestors. Kevin Cordon additionally draped an American flag over his shoulders as if it was a cape.

---

[1] Notably, on January 7, 2021, Sean Cordon returned two canisters of bear spray to the R.E.I. store in Washington, D.C. In Kevin Cordon's mandatory post-plea interview, he admitted that his brother purchased these items after they arrived in Washington, D.C. for protection and returned them unused. When asked whether he carried the items on January 6, Kevin Cordon stated they were his brother's purchases and he did not personally carry them.

After the rally, the Cordon Brothers walked to the U.S. Capitol. They had waited around the Ellipse for roughly forty-five minutes before walking to the Capitol. When they arrived, rioters had already pushed their way up the scaffolding leading to the Upper West Terrace. The Cordon Brothers arrived at the Upper West Terrace at approximately 2:15 p.m. It was a mob scene. Rioters crowded to the Senate Wing door and its entranceway. Both brothers recalled watching a rioter push a police officer and get in a shoving match. During the altercation, a rioter threw what Kevin Cordon believes was a water bottle, which hit him near his eye and caused him to bleed. Sean Cordon at one point described it as a riot scene. In a partial statement to law enforcement at the time of his arrest, Kevin Cordon admitted to being on the grounds of the U.S. Capitol and explained that law enforcement were "surrounded by a lot more people."

The Cordon Brothers walked around this area for several minutes before immersing themselves in the thick of the crowd to enter the U.S. Capitol. (For clarity, the government has inserted red ovals to identify the brothers in the below still shots).







The U.S. Capitol was first breached in this area at approximately 2:13 p.m. when a rioter smashed out a window adjacent to the Senate Wing door with a riot shield and a rioters jumped through it over broken glass.



The Cordon Brothers entered in the same location at approximately 2:25 p.m. by climbing through the window on the other side of the Senate Wing door, which rioters had also broken to force entry. As the Cordon Brothers climbed through the window, other rioters joined suit in pouring through the window and adjacent door.









The Cordon Brothers then walked through the Crypt among other rioters.



While there, Sean Cordon took a cell phone video of him and his brother, boasting "We're in the Capitol" as the cell phone pans around the Crypt.



Shortly thereafter on the recording, one of the brothers stated "alright, let's go out the way we came." The two then retraced their steps through the Crypt and the hallway by the Senate Wing door. At approximately 2:30pm, they exited the Capitol through a window next to the Senate Wing door. The Cordon Brothers were in the Capitol for close to five minutes.

Once outside, the Cordon Brothers walked around to the eastern front of the Capitol. While in that area, a reporter from *Ilta Sanomat*[2] interviewed Kevin Cordon.

---

[2] *Ilta Sanomat* is a prominent tabloid-sized evening newspaper with a large digital media presence in Finland. *See https://en.wikipedia.org/wiki/Ilta-Sanomat*



At the outset of the interview, when explaining what happened in the Capitol, Kevin

Cordon expressed:

> We're here to take back our democratic republic. It's clear that this election is stolen, there's just so much overwhelming evidence and the establishment, the media, big tech are just completely ignoring all of it. And we're here to show them we're not having it. We're not- we're not just gonna take this laying down. We're standing up and we're taking our country back. This is just the beginning.

At another point in the interview, when the reporter asked Kevin Cordon why he entered the

building, he replied:

> It was um, it was a once in a lifetime opportunity to show that the people of this country are not gonna take this corruption laying down. And we're gonna show that we have the power. We have the power in numbers, we have the power in spirit to show them that they can't just push us around and take over our country with their corruption. So we had to actually step foot in their building that they think their [sic] own. And that's why everybody was shouting, "this is our house." Because it is! This is for the people, by the people, of the people government. And we needed to remind them because-- and we need to remind ourselves. I needed to remind myself and I needed to remind the rest of the public that this is our

> country. This country was founded on individuals having their own sovereignty over their own lives and I think a lot of the public has forgotten that. And we're back to show that we're - we're reawakening to that reality that this is our country and we're not gonna take that nonsense.

As early as January 7, 2021, *Ilta Sanomat* published a written article and posted the video of the interview on its website, which can be viewed at: https://www.is.fi/ulkomaat/art-2000007723759.html (last accessed on November 4, 2021).

The Cordon Brothers left Washington, D.C. on January 7 and returned to Los Angeles, CA. When law enforcement executed a search warrant on Kevin Cordon's residence on March 9, 2021, the flag the defendant wore as a cape on January 6, 2021 was hung, like a trophy, over his bed.



*Sean Cordon's Statement to Law Enforcement*

Sean Cordon also made a statement to law enforcement at the time of his arrest on March 9, 2021. The defendant admitted to going inside the U.S. Capitol with his brother, Kevin Cordon, explaining he did not go to be violent but to "watch the . . . the Jerry Springer situation." After entering the U.S. Capitol, he saw that people were standing around not knowing what to do, recognized they did not belong and left with his brother the same way they entered. When explaining why he went inside the U.S. Capitol, he relayed that he "went in like a reporter . . . curious wanting to document the scene . . . just know for [his] own sake, but . . . . that was a big mistake on [his] part."

*Kevin Cordon's Pre-Sentencing Statement to Law Enforcement*

On October 21, 2021, Kevin Cordon took part in a debrief with law enforcement pursuant to his plea agreement. He admitted to going inside of the U.S. Capitol out of adrenaline and wanting to see what was going on. Once inside, he decided it was a "bad idea" and needed to leave.

## III.    The Charges and Plea Agreement

On March 4, 2021, Sean Cordon was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G). On March 9, 2021, he was arrested at his home in California. On April 1, 2021, he was charged by a four-count Information with 18 U.S.C. §§ 1752(a)(1) and (2) and 40 U.S.C. §§ 5104(e)(2)(D) and (G).

On August 27, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating or Picketing in a Capitol Building. As part of the defendant's plea agreement, he agreed to allow law enforcement to

review his social media accounts and pay restitution of $500. The defendant has satisfied both of those conditions of his plea agreement.

### IV.  Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his or her plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). By plea agreement, the parties have agreed that the riot caused approximately $1.5 million of damage to the United States Capitol and the defendant agreed to pay restitution in the amount of $500. That restitution should be paid to the Architect of the Capitol as indicated in the PSR. PSR ¶ 83.

As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### V.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, the Section 3553(a) factors jointly weigh in favor of a significant period of home detention.

## A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each individual person who entered the Capitol on January 6 did so under the most extreme of circumstances. As a person entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement and likely would have smelled chemical irritants in the air. Make no mistake, no rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant engaged in any violence or encouraged violence; (3) whether the defendant engaged in any acts of destruction or encouraged destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these

factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The defendant's entry into the Capitol raises significant concerns. Even before entering, the defendant and his brother lingered around the Upper West Terrace as they watched "a riot situation" unfold where law enforcement officers were "surrounded by a lot more people." Rioters crowded the Senate Wing door as they broke through the windows and opened the door to flood into the Capitol. The Cordon Brothers witnessed a rioter push and shove a police officer as Kevin Cordon was hit with a stray object causing injury. They clearly knew they did not have permission to enter the Capitol. They did so anyway.

Moreover, the actual manner in which they entered the Capitol illustrated their entry was wrongful. The defendant and his brother each climbed through a window to get into the Capitol. The act of climbing through the window alone underscores their intent.

Furthermore, they entered the Capitol early in the breach. The defendant and his brother climbed through the window within 15 minutes from when the Capitol was initially breached in the same location. They were in the Capitol early, and their presence added numbers to the mob that overwhelmed law enforcement.

More troublingly, the defendant was prepared for violence. Both of the Cordon Brothers wore light armor with protective plates and a gas mask. Whatever the reason the defendant had for donning this gear in the first place, they projected an aggressive posture in the midst of a mob pouring into the Capitol and confronting law enforcement officers. The presence of body armor greatly enhances the danger associated with the defendant's conduct. Even without engaging in violence himself, the defendant's use of these items helped show the overwhelmed law

enforcement that they were facing a crowd of people dressed as combatants prepared to fight them back.

He and his brother were in the U.S. Capitol for less than five minutes. After breaking into the Capitol from close to the Senate Wing door, they walked to the crypt, and then they turned around and left the same way they had come. While too late to stop them from committing the crime in the first place, they seem to have quickly realized the unlawful and serious nature of their entry into the Capitol. Neither of the Cordon Brothers engaged in any violence or directly confronted law enforcement.

Significantly, the defendant soon realized the wrongfulness of his actions and admitted as much to law enforcement early in this case. At the time of his arrest, the defendant told law enforcement that he went inside the Capitol when he knew it was wrong to do so. While he characterized his intent as wanting a first-hand account of what was happening, he was nonetheless candid about going to the Capitol, entering the Capitol and discussing what he did inside the Capitol. Moreover, the defendant took the first available opportunity to plead guilty and accept responsibility for his actions.

### B.  The History and Characteristics of the Defendant

The defendant is a single 35-year-old father of two. He was born in Los Angeles, CA and described growing up in a stable household. He has lived in the Los Angeles, CA area his entire life. He graduated college with a Bachelor of Science in Mechanical Engineering. The defendant currently owns his own business, a commercial cleaning service. Previously, the defendant worked as an engineering manager, manufacturing truck bodies for service vehicles. He lost this job due to his involvement in the instant offense. The defendant was arrested twice in 2009, but he has not been convicted of any crimes.

16

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases arising out of the riot on January 6, 2021, including in misdemeanor cases. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The demands of general deterrence weigh in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. For the violence at the Capitol on

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the transfer of power. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Specific deterrence is likewise appropriate given the seriousness of the defendant's actions. The defendant well knew that he did not have permission to enter the Capitol. He may have persisted out of his own curiosity; regardless, his actions contributed to the mob. More so, he arrived ready for violence. Entering the Capitol this way escalates the significance of the defendant's crimes. Dawning light body armor and wearing a gas mask helped convey to law enforcement that the mob would not be deterred. Joining the mob in the manner the defendant did warrants specific deterrence.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress. Each offender must be sentenced based on their individual circumstances, but with the backdrop of January 6 in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lesser end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[4] Indeed, the government invites the Court to join

---

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its prior agreement to recommend probation in these cases. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

 While the number of sentenced defendants is low, we have already begun to see meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. While those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention. To give some critical context, as of Friday, October 29, 2021, the government had issued approximately 268 pleas in misdemeanor and felony cases. Of those 268 pleas, only five included an agreed-upon request of probation. The remaining cases, based on their relative factors, their role in the breach, and their relative acceptance of responsibility, deserve incarceration and/or home detention. The defendant falls in this camp.

 After a review of the applicable Section 3553(a) factors, the government believes that the defendant should be sentenced to a term of home detention for his role in the Capitol Riot, during which he (1) witnessed rioters fighting with law enforcement outside the Capitol and persisted in entering anyway; (2) entered soon after the initial breach at the Senate Wing door by climbing

through a window; and (3) dressed in preparation for violence by dawning a vest of body armor and carrying a gas mask..

The Court scheduled the Cordon Brothers to be sentenced at the same time. While they participated in the Capitol Riot together, there are important differences that warrant consideration in fashioning an appropriate sentence. Notably, on January 6, Sean Cordon did not publicly broadcast support for riot. Accordingly, while the harm he committed that day is significant, it was limited to the less than five minutes he was in the U.S. Capitol. Additionally, he quickly admitted to the wrongfulness of his actions, admitting to agents that he entered the Capitol at the time of his arrest. As well, he expressed his intent to plead guilty and accept responsibility for his actions at the earliest opportunity to do so.

## VI.    Conclusion

For the reasons set forth above, the government recommends that the Court impose a sentence of six months home detention, a probationary term of three years, 60 hours of community service, $500 in restitution, and the mandatory $10 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:     /s/ *Clayton O'Connor*
CLAYTON H. O'CONNOR
Trial Attorney, Detailee
MD Bar No. 0512150005
555 Fourth St NW
Washington, DC 20530
clayton.oconnor@usdoj.gov
(202) 262-9895